UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
UNITED STATES OF AMERICA,


     – against –                           No. 21-cr-264 (JLC)


CHAIM DEUTSCH,

                    Defendant.

------------------------------------------------------------------------x

---

## SENTENCING MEMORANDUM OF DEFENDANT CHAIM DEUTSCH

---

**MEISTER SEELIG & FEIN, LLP**
**By: Henry E. Mazurek, Esq.**

***Attorneys for Chaim Deutsch***
125 Park Avenue, 7th Floor
New York, New York 10017
Phone: (212) 655-3500
Fax: (212) 655-3535

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... ii

EXHIBIT LIST ........................................................................................................... v

I.      INTRODUCTION.................................................................................1

II.     CHAIM DEUTSCH'S EXEMPLARY RECORD OF PUBLIC SERVICE AND COMMITMENT TO HIS FAMILY MERIT A PROBATIONARY SENTENCE…………………………………………………………4

    A.  Community Service Has Always Been Chaim's Primary Focus...................................5
    B.  City Council Service Was Chaim's Opportunity to Help a Broader Community .........9
    C.  Chaim Learned the Importance of Empathy During His Humble Upbringing ...........14
    D.  Chaim is Devoted to His Family and They Depend on Him ........................................15
    E.  Chaim Has Always Worked Hard to Support His Family and Recently Made Great Strides Towards Rehabilitation ...................................................................17

III.    A PROBATIONARY SENTENCE WOULD SERVE AS JUST PUNISHMENT THAT ACHIEVES GENERAL AND SPECIFIC DETERRENCE .......................................................................................19

    A.  Chaim is Remorseful and Dedicated to His Rehabilitation .........................................20
    B.  Chaim's Conduct Already Has Caused Substantial Collateral Consequences Impacting All Aspects of His Life...................................................................24

IV.    A PROBATIONARY SENTENCE IS FURTHER APPROPRIATE AS IT WOULD NOT CAUSE AN UNWARRANTED DISPARITY ........................26

V.    THE PROBATION DEPARTMENT ALSO RECOMMENDED A PROBATIONARY SENTENCE .......................................................................30

VI.    CONCLUSION .......................................................................................31

i

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Kimbrough v. United States*,
   552 U.S. 85 (2007)................................................................................................................ 27

*Peugh v. United States*,
   569 U.S. 530 (2013) (quoting *Gall v. United States*, 552 U.S. 38 (2007) ................................. 2

*United States v. Adelson*,
   441 F. Supp. 2d 506 (S.D.N.Y. 2006) .................................................................................... 2

*United States v. Andrew Stein*,
   No. 10-cr-1171, ECF Doc. 1, Misdemeanor Information (S.D.N.Y. Nov. 29, 2010) ............. 27

*United States v. Desilva*,
   No. 08-CR-332, 2010 WL 532987, at *2 (E.D.N.Y. Feb. 8, 2010)........................................ 19

*United States v. Edwards*,
   No. 12-CR-266, ECF Doc. 21, Judgment of Conviction (E.D.N.Y. 2013) ............................ 29

*United States v. Emmenegger*,
   329 F. Supp. 2d 416 (S.D.N.Y. 2004) .................................................................................... 25

*United States v. Evans*,
   2:11-cr-00139-TFM (W.D. Pa. 2012)..................................................................................... 29

*United States v. Floyd*,
   No. 10-CR-00309 (VM), ECF Doc. 89, Judgment of Conviction (S.D.N.Y. Apr. 8, 2013).... 29

*United States v. Gupta*,
   904 F. Supp. 2d 349 (S.D.N.Y. 2012) ...................................................................................... 4

*United States v. Halpern*,
   17-CR-189 (CMR) (E.D.P.A. 2019)........................................................................................ 29

*United States v. Hamilton*,
   323 F. App'x 27 (2d Cir. 2009) ........................................................................................ 23, 24

*United States v. Hand,*
   15-CR-509 (WHW) (D.N.J. 2016) ......................................................................................... 29

*United States v. Hodges*,
   No. 07-CR-706, 2009 WL 36231, at *8 (E.D.N.Y. Feb. 12, 2009)........................................ 23

*United States v. Kenneth Starr and Andrew Stein*,
   No. 10-mj-01135-UA (S.D.N.Y. 2010) .................................................................................. 27

*United States v. Nesbeth,*
    188 F. Supp. 3d 179 (E.D.N.Y. 2016) ................................................................... 26

*United States v. Nikc,*
    No. 20-CR-173 (NSR) (S.D.N.Y. Nov. 24, 2020) ................................................. 28

*United States v. Park,*
    No. 12-CR-344 (FB), ECF Doc. 21, Judgment of Conviction (E.D.N.Y. October 3, 2014).... 28

*United States v. Pauley,*
    511 F.3d 468 (4th Cir. 2007) ............................................................................... 26

*United States v. Salvador,*
    No. 98-CR-484 (LMM), 2006 WL 2034637, at *5 n.7 (S.D.N.Y. July 19, 2006) ................. 17

*United States v. Sanchez,*
    No. 99-CR-338, 2007 WL 60517, at *4 (S.D.N.Y. Jan. 8, 2007) ............................. 23

*United States v. Shokler,*
    No. 12-CR-415 (JBW), 2013 WL 4851695 (E.D.N.Y. Sept. 10, 2013) .................... 28

*United States v. Slater,*
    No. 04-CR-48-036 (JSR), 2012 WL 6808470, at *1 (S.D.N.Y. Dec. 28, 2012) .............. 3

*United States v. Stewart,*
    590 F.3d 93 (2d Cir. 2009) ................................................................................. 26

*United States v. Stowe,*
    375 F. Supp. 3d 276 (E.D.N.Y. 2019) ................................................................ 19

*United States v. Taffaro,*
    919 F.3d 947 (5th Cir. 2019) ............................................................................... 29

*United States v. Villela,*
    No. 07-CR-287 (RWS), 2007 WL 2845290 (S.D.N.Y. Sept. 25, 2007) ................... 29

*United States v. Wills,*
    476 F.3d 103 (2d Cir. 2007) ............................................................................... 27

*United States v. Yun,*
    No. 19-CR-00131 (AMD) (E.D.N.Y. 2019) ........................................................ 28

**Statutes**

18 U.S.C. § 3553 ................................................................................................... 2

18 U.S.C. § 3553(a) ....................................................................................... passim

18 U.S.C. § 3553(a)(1) ...................................................................................... 3, 17

18 U.S.C. § 3553(a)(1)(C) ................................................................................................. 24

18 U.S.C. § 3553(a)(2)(A) ................................................................................................. 20

18 U.S.C. § 3553(a)(2)(B) ........................................................................................... 20, 26

18 U.S.C. § 3553(a)(6) ..................................................................................................... 27

18 U.S.C. § 944(j) ............................................................................................................. 3

**EXHIBIT LIST**

| |
|---|
| **Exhibit 1: Chaim Deutsch Letter** |
| **Exhibit 2:  Letters from the Deutsch Family** |
| Sarah Deutsch Letter |
| Sheva Deutsch Letter |
| Rachelle Sauer Letter |
| **Exhibit 3: Letters from Community Members** |
| Mark Caller Letter |
| Pinchas Chatzinoff Letter |
| Steven D. Cohn Letter |
| Laurie A. Cumbo Letter |
| Yuri Dechkanov Letter |
| Ezra Friedlander Letter |
| Leon Goldenberg Letter |
| Ezra Hanon Letter |
| Rizy Horowitz Letter |
| Inna Ikhilov Letter |
| Aharon Kahn Letter |
| Shari Kaplan Letter |
| Aryeh Katzin Letter |

| |
|---|
| Edward E. Klein Letter |
| David Loeb Letter |
| David Mandel Letter |
| Rachael Mandelbaum Letter |
| Irina Manasherova Letter |
| Kevin McCall Letter |
| Juby Shapiro Letter |
| Marina Sheykman Letter |
| Alla Sorina Letter |
| Raphael Treitel Letter |
| Mikhail Vinitsky Letter |
| Ariella Weiss Letter |
| Morris J. Zakheim Letter |
| Susanne Faye Zakheim Letter |
| David Zwiebel Letter |
| Tova Chatzinoff Letter |

Defendant Chaim Deutsch respectfully submits this sentencing memorandum in support of his request for a non-custodial sentence with one year of probation.

## I.      INTRODUCTION

The sentencing statute provides that "[t]he court shall impose a sentence sufficient, but not greater than necessary."  18 U.S.C. § 3553(a).  The arc of Chaim's life merits a non-custodial sentence.

Outside of the offense conduct here, Chaim Deutsch has lived a law-abiding, productive, and prodigious life of public service. His life is one of exceptional accomplishment marked by substantial contributions to society. He has held without interruption full-time employment, and often multiple jobs at once, since being a young teen. His first full-time job was making kosher pizzas in a pizzeria in Brooklyn.  He also has worked as an assembly-line worker and foreman in a garment factory, has been a property manager for multiple apartment buildings in Brooklyn, while also simultaneously volunteering to create a neighborhood watch group (called "Shomrim"), and interning for his local City Councilman.

While working full-time as a property manager, he was formally hired to also work part-time during evenings and on Sundays as staff to City Councilmen Lloyd Henry and Mike Nelson. In all, Mr. Deutsch worked 16 years as an aide to District 48's City Council members before being elected as Councilman himself for that same district.  He then served with distinction for seven-and-a-half years on City Council before summarily being removed from office as a result of this misdemeanor offense.[1]  Before New York City Council changed its rules in 2016 banning most

---

[1] While the PSR reported that Mr. Deutsch "is in the process of attempting to be reinstated," (PSR, Addendum, p. 22), that is no longer the case.  Mr. Deutsch, while objecting to the lack of due process in his removal, has accepted the City Council's decision and has moved on in his life.  As explained in detail below, he obtained private employment as a property manager for a

outside work by members, Mr. Deutsch spent a total of *20 years* holding down two jobs simultaneously: property manager and service to City Council.  Mr. Deutsch has spent a lifetime working hard at "blue collar" jobs and in public service.  His employment and volunteer record is commendable in its exhausting durability alone.

This commitment to public service, while also holding down full-time employment to provide for his family, epitomizes Chaim Deutsch's character.  Strong, resourceful, and ambitious, Chaim Deutsch prides himself on hard work, caring for others, and ensuring a stable life for his family.  The offense conduct, a first-time misdemeanor, is clearly out of character for this man who prioritized service over leisure and family time.  Chaim literally spent thousands of hours in public service—hours taken from his own family and given to the service of others.  This personal record, together with his ongoing need to continue to work to provide for his family financially and repay his debt to the government, weigh in favor of a non-custodial sentence. Indeed, the Probation Department recognized these factors in its own recommendation for a probationary sentence, concluding: "we recommend a variance to three years' probation . . . [which] takes into account the factors found in 18 U.S.C. § 3553, such as the defendant's family responsibilities, lack of a prior record, and his positive adjustment to pretrial supervision." (PSR Addendum at 23.)

Thus, while the Court's sentencing analysis must begin "by correctly calculating" the applicable advisory United States Sentencing Guidelines ("Guidelines") range, that calculation has not—and cannot—capture Chaim's humanity and the good he has done in his life for his family and community.  *Peugh v. United States*, 569 U.S. 530, 536 (2013) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)).  The advisory Guidelines range, in this case 10-12 months' imprisonment,

---

new employer (unrelated to his earlier positions as property manager).  He needs this job to provide financially for his family and to help repay his restitution obligation in this case.

is but one element of the Court's consideration. And they vastly overstate a reasonable sentence in this case. Particularly given Chaim's personal history, and complete acceptance of responsibility, a probationary sentence, consistent with the PSR's recommendation, is sufficient but not greater than necessary punishment for Chaim's crime. *See, e.g., United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006) ("if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.").

Finally, given that this is Chaim Deutsch's first offense, and it is a misdemeanor— characterized in the federal criminal code as a lesser offense to felonies—a probationary sentence is also consistent with Congress's mandate that first-time non-violent or otherwise less serious offenders be sentenced to probation. *See* 18 U.S.C. § 944(j) (directing the Sentencing Commission "insure that the guidelines reflect the general appropriateness of imposing a sentence *other than imprisonment in cases in which the defendant is a first time offender* who has not been convicted of a crime of violence or an otherwise serious offense") (emphasis added). The Sentencing Commission has found that first-time offenders of any age are far less likely to recidivate than those with criminal history and that recidivism declines as age increases. *See Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, U.S. Sentencing Comm'n (2004).[2] In short, Chaim Deutsch is among the least likely offenders to recidivate and among those Congress intended to receive a non-custodial sentence.

---

[2] Available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf.

## II.   CHAIM DEUTSCH'S EXEMPLARY RECORD OF PUBLIC SERVICE AND COMMITMENT TO HIS FAMILY MERIT A PROBATIONARY SENTENCE

The first statutory factor that the Court is instructed to consider is "the nature and circumstances of the offense and the history and characteristics of the defendant." *United States v. Slater*, No. 04-CR-48-036 (JSR), 2012 WL 6808470, at \*1 (S.D.N.Y. Dec. 28, 2012) (quoting 18 U.S.C. § 3553(a)(1)).   "The Guidelines virtually ignore this measure of the man, but here as elsewhere the Guidelines must take second place to section 3553(a), which requires a court to take account of a defendant's character in imposing sentence."   *United States v. Gupta*, 904 F. Supp. 2d 349, 354 (S.D.N.Y. 2012).

Chaim, 52 years old, is the son of Holocaust survivors who immigrated to Brooklyn in search of a safe place to raise a family in their orthodox Jewish tradition.  The third of four brothers, Chaim grew up in near poverty.  Despite their own lack of resources, Chaim's family taught him that it was important to help others in their day-to-day struggles.  When Chaim was only 19 years old, newly married and with a child on the way, he began his career of public service by volunteering to start a neighborhood watch group, which became the Flatbush Shomrim Safety Patrol.  He did this while working full-time as a foreman at a garment factory in Williamsburg. His experience with this neighborhood patrol group helped spur decades of public service, culminating in his election to New York City Council in 2013.

As evidenced by the numerous letters submitted here, Chaim was a dedicated staff to City Council and later a Council member himself, who made a real difference in the lives of his constituents and helped to improve our city for all New Yorkers.  He was known for his empathy and personal attention to every issue that was brought to him.  He served a total of 20 years, as staff member and Councilmember, until April of this year when he was summarily removed from office due to this misdemeanor.  He and his wife, Sarah, have five children, ranging in ages from

4

15 to 31.  Chaim is also a proud grandfather of three.  He fortunately was able to find new private employment after his guilty plea in this case, working again as a property manager at an apartment complex in Brooklyn.  He seeks to keep this job to be able to continue to provide for his two minor children who reside at the family home with him and his wife, and to repay his outstanding tax debt to the government. (See Ex. 1, Letter of Chaim Deutsch ("Thankfully, in the last weeks, I have been able to find a new job as a property manager for a large apartment complex in Brooklyn. I am now able to continue to pay my family's bills.").)

### A.    Community Service Has Always Been Chaim's Primary Focus

From his earliest years, Chaim Deutsch, has been exceptionally dedicated to public service. As an 18-year-old returning home to New York City after completing yeshiva studies in Rochester, Chaim witnessed the daily hardships that neighbors in his community were facing in his Flatbush/Midwood, Brooklyn neighborhood. With the City unable to provide sufficient services, Chaim regularly encountered youth—barely older than children—lacking adequate supervision and drinking in local parks, and homeless men and women in need of shelter and basic sustenance. To support his neighbors in need, and care for his tight-knit community, Chaim helped found the Flatbush Shomrim Safety Patrol.[3]  The Shomrim was designed to help increase residents' quality of life, serve as the neighborhood eyes and ears of the police, and combat an increase in local crimes and offenses.

The Shomrim was initially founded by just a few neighbors—with Chaim at the helm— who were dedicated to their community's safety and well-being.  They lacked reliable funding and had to make do with volunteers donating their time.  In its early years, although the Shomrim used private vehicles and borrowed radios with limited range, the neighborhood patrols still managed

---

[3] This organization was originally called the "Midwood Shomrim."

to make a real impact.  Their success was the product of Chaim's dedication.  Chaim spent long nights patrolling a 40-square block area on alert for individuals on the streets in-need, so the organization could direct them to resources and counseling.  (*See* Ex. 2,  Letter of Sarah Deutsch at 1 -3 ("While most twenty-year-olds would spend nights out with friends, my husband would be patrolling the streets of Flatbush."); Ex.3, Letter of David Mandel, CEO of Ohel Children's and Family Services at 21-22 (Chaim spent "overnights" walking the streets of Brooklyn; he was always "a patient listener, showed insight and empathy in guiding scores of individuals back to a safe place.").)

After founding Shomrim, Chaim looked outside his own orthodox Jewish community to help those beyond his immediate neighborhood.  The Shomrim formed a partnership with the Umaa Group, a similar organization formed by Muslim families.  Chaim took pride in this successful alliance between these sometimes mutually wary communities—it inspired his pursuit of a uniquely New York vision of public service that works between and across often dissimilar communities, and bridges cultural divides.  (*See* Ex. 3, Letter of Rabbi Aharon Kahn at 15 (Chaim was persistent in his efforts to bring "Muslims and Jews together and help make them understand they have much in common.").)

Chaim's work with the Shomrim safety patrol opened up a whole world of public service to him.  Neighbors quickly recognized the Shomrim's successful initiatives, and began connecting Chaim with funding sources to improve the group's services.  Even the district's Congressman at the time, Edolphus Towns, was so impressed with Chaim and the group's volunteer work that Rep. Towns helped them obtain federal funding for the Flatbush Shomrim in that year's criminal justice budget.  With this additional funding, Chaim and his fellow volunteers transformed the Flatbush Shomrim from a group of involved neighbors into a professionalized volunteer organization with

well-funded skills training and equipment. In the next several years, Chaim worked steadily to broaden the Shomrim's scope: he organized training sessions with local law enforcement, extended the organization's mission, and established both a search and rescue unit and an anti-domestic violence task force. The community volunteer organization flourished with Chaim's guidance and persistence. Thirty years after its founding, the Flatbush Shomrim is still a crucial community resource, answering over 4,000 calls annually.

In addition to his work with the Shomrim, Chaim also volunteered his services to help individuals and families receive a whole host of social welfare assistance. He is an active member of numerous community and non-profit organizations, including the Council of Jewish Organizations of Flatbush, and has remained particularly focused on helping "at-risk" youth through informal organizations like the "Teens at Risk," which meets every Friday night at the home of a local social worker and serves as a safety net for local youth in need. Susanne Faye Zakheim, a social worker who has worked alongside Chaim for 25 years recounts Chaim's "passion" for personally helping young people, in particular, those grappling with "serious drug issues" that have impacted their community since the 1990s. Indeed, Chaim takes time away from his family nearly every Friday night, missing Sabbath dinner, to attend a "Teens at Risk" event at Zakheim's home. He supports and encourages the youth who attend, telling stories of community members who have successfully overcome adversity. Ms. Zakheim describes Chaim's "depth of caring" as he talks to teenagers about overcoming adversity. (*See* Ex. 3, Letter of Susanne Faye Zakheim at 38-40 (describing Chaim's attentiveness to the "Teens at Risk" group ).)

After several years of regular, committed, local volunteer work, Chaim knew that community service was truly his calling. He wanted to devote himself to full-time public service and gain access to government resources so he could help provide for his community's needs. In

1996, Chaim obtained his first paid public service position, working in constituent services for then-District 48 City Council Member Reverend Lloyd Henry. Chaim thrived in this work. It was a natural extension of his role with the volunteer neighborhood patrol. He attended community meetings and assisted district residents in accessing city services.

Chaim continued to remain on staff of the District 48 City Council office when Mike Nelson became Councilman, and Chaim served for another 8 years, making his total service time in the office a considerable 16 years. As Nelson's closest deputy, Chaim took broad responsibility for constituent outreach. He became the "go-to" person for "any kind of assistance to ensure that approved programs and/or services are expedited for the community when necessary." (Ex. 3, Letter of Morris J. Zakheim at 36-37; *accord id.*, Letter of Edward Klein at 18-19 (Chaim "was always there as a concerned liaison" between the Councilman's Office and constituent groups like an organization dedicated to helping newly-arrived Russian immigrants).) Although technically Chaim's position was part-time, he often spent more than 40 hours per week helping constituents and responding to requests for City government aid. He did this while also maintaining a full-time position as super and property manager for a number of Brooklyn apartment buildings, as this job paid most of his family bills. Chaim made sure to respond to tenants' needs about clogged toilets and locked-out residents as quickly and earnestly as he did with the district's constituents.

Chaim's emergency response to his neighbors and constituents when Hurricane Sandy deluged South Brooklyn in October 2012, highlights his dedication to community. As Chaim's wife Sarah, recalls: "During Hurricane Sandy [Chaim] did not run from the hurricane, he ran to it." (Ex. 2, Letter of Sarah Deutsch at 1-3.) Before the storm, Chaim went door to door in the neighborhood to encourage compliance with evacuation orders. (*Id.*) When the storm brought unprecedent flooding, he used every resource at his disposal, including Shomrim equipment and

volunteers, to rescue people from their homes, even rescuing his boss, Councilman Nelson, from his home in Sheepshead Bay.  (*Id.*)  Chaim marshalled his contacts at city agencies to direct resources to the area.  (Ex. 3, Letter of Edward Klein at 18-19 (Chaim brought Department of Sanitation trucks to the district to clear out the basements of two apartment buildings, allowing building services to resume).)  When the storm passed, South Brooklyn was devastated.  Chaim continued to work incessantly.  As his wife recounts: "For weeks and weeks we did not see him because he was out volunteering in the hard-hit communities.  He helped people who had lost their homes, and those who needed food and basic supplies." (Ex. 2, Letter of Sarah Deutsch at 1-3; *accord* Ex. 3, Letter of Letter of Rabbi Pinchas Chatzinoff, at 2-3) (Chaim's "inspired leadership" helped to bring emergency services to the "most challenged people of Brooklyn.").)  Chaim did not shirk from the months of ceaseless work in the hurricane's immediate aftermath.  He was committed to serve his community.

## B.    City Council Service Was Chaim's Opportunity to Help a Broader Community

Chaim's decades of public service culminated in his City Council election.  In 2013, with Councilman Nelson's final term nearing its end, Chaim ran to fill the vacant City Council seat.  He narrowly won both the Democratic primary and general election with a campaign that united and celebrated New York's diverse communities and focused on the simple message of caring for one another.  That was Chaim's lived experience as a New Yorker, and he hoped to implement that message for his constituents and New Yorkers more broadly.  Certainly, the voters appreciated his work for them, re-electing him with a substantially larger margin in 2017.

To Chaim, though, his electoral successes were far less significant than the power he had in the City Council to improve his constituent's lives.  He viewed this opportunity as a "service to his fellow man, a higher calling."  (Ex. 3, Letter of Rabbi Pinchas Chatzinoff at 2-3.)  From 2014

through April 2021, Chaim used his position as representative of the 48th District in Brooklyn to do more than ever for members of his community.  (*See* Ex. 3, Letter of Marina Sheykman at 30-31) (as a constituent, Ms. Sheykman reports that "[t]he concerns I brought to Chaim's office were plenty, and every single one was acknowledged instantly by his staff.").)  He served on several additional City Council committees that worked assiduously to improve New Yorkers' daily lives, including Fire and Emergency Management; Land Use; Transportation; Aging; and Sanitation and Solid Waste Management.  And he regularly worked nights and weekends helping constituents and neighbors with everything from benefits applications, to personally funding a needy young mother's account at a local grocery.  Chaim's personal cell phone was a neighborhood resource for city services.  (*See* Ex. 3, Letter of Morris J. Zakheim at 36-37; Ex. 3, Letter of Rizy Horowitz, Nachas Health & Family Network at 13) (Chaim was the "go to" and "first" person to turn to when seeking a solution).)

In Chaim's City Council office, the most important tasks were those that directly helped individuals better their daily lives, regardless of the political benefits.  His core belief, rooted in his childhood on the margins with two refugee parents who fled the Holocaust, is that language or cultural barriers should not foreclose access to government services.  And Chaim implemented that mantra as City Councilmember.  "Chaim distinguished himself with his vision of a government that truly serves the people." (Ex. 3, Letter of Rabbi Pinchas Chatzinoff, at 2-3).  Thus, as Rabbi Chatzinoff describes, while "other council members vied for opportunities to serve on high profile or powerful committees, Chaim was energized to focus his talents on special care for senior citizens and veterans. He saw these sectors of the community as too easily forgotten by the power brokers, while being most deserving of our grateful advocacy and dedication."  (*Id*.)  Chaim

consistently "demonstrated great compassion and generosity for those unable to speak for themselves." (Ex. 3, Letter of Ezra Friedlander at 8-9.)

No constituent's need was too mundane or too inconvenient for Chaim. For example, one of his former staff members recalls a young single mother who came into the office seeking assistance signing up for food stamps. (Ex. 3, Letter of Tova Chatzinoff at 42-44.) The staff member helped her fill out the application and sent the young mother on her way. When Chaim reviewed the day's work, he asked the staff member what had been had done to ensure the young woman had food while her food stamp application was pending. When the answer was nothing, Chaim set up a tab at a local grocery store with his personal credit card and called the young woman to tell her that she could now buy what she needed to feed herself and her family. (*Id*.) "Stories like that happened every day . . . . He has a way of thinking outside the box, of putting himself into other people's shoes and identifying what their needs are, sometimes before they realize for themselves." (*Id*.) Rabbi Pinchas Chatzinoff's letter recounts another quintessential example of Chaim's devotion to improving his constituents' lives: when an elderly constituent had a severe plumbing problem, and could not get help from her building, Chaim personally "went to the woman's apartment in the evening with his own toolbox to make the repairs himself." (*Id*., Letter of Rabbi Pinchas Chatzinoff at 2-3.)

Plainly, as City Council representative, Chaim believed that his role extended beyond technocratic improvements—he understood that people looked to him for compassion and support on a human level. To that end, he routinely got personally involved in his constituents' and neighbors' struggles and tragedies, offering not only assistance in the form of city services, but empathy and emotional support as well. For example, a mother of a special needs student who became "increasingly aggressive and angry" as a result of schools being closed during the

pandemic, writes about how Chaim personally checked in on them and provided information about resources throughout the pandemic.  Chaim went out of his way to ensure that the family "fe[lt] so validated, cared for and like we had a voice to talk about our struggles." (Ex. 3, Letter of Ariella Weiss at 35; *accord* Ex. 3 Letter of Alla Sorina at 32 (describing how Chaim offered to *personally* remove fallen trees after a tropical storm); Ex. 3, Letter of Shari Kaplan at 16 (when a local resident suggested modernizing a dog park in the district, Chaim secured the funding and created "one of the most beautiful dog parks in the city."  When it opened, he called the resident who had made the suggestion, met her at the park, and invited their families to meet. During an hour spent together, the constituent "got to know the councilman as a genuine, concerned family man.").) Chaim "pays attention to detail," and always showed genuine care: he "notices a frown in a crowd of smiles."  (Ex. 3, Letter of Yuri Dechanov at 7.)

He also used his position in City Council to advocate for systemic changes that promoted safety and calm for all New Yorkers.  He was a strong advocate for families of New Yorkers killed in traffic accidents and for redesigning streets to prioritize pedestrian safety. He worked on behalf of veterans to establish funding for employment and housing programs for men and women returning from combat.  And, as the police reform movement rose to prominence, Chaim worked to bridge the gap between law enforcement and the community. *See, e.g.,* Chaim Deutsch and Kevin McCall, "Four steps toward safety and better police-community relations," *New York Daily News* (July 30, 2020).[4]

Chaim's advocacy and calm leadership were particularly crucial for his district during the COVID-19 pandemic.  During the frightening times of Spring 2020, Chaim personally distributed

---

[4] Available at: https://www.nydailynews.com/opinion/ny-oped-four-steps-toward-safety-and-better-police-community-relations-20200730-winxsa5drjbhxg3xi27uyt47hm-story.html.

masks at constituents' homes to ensure they had the PPE they needed to stay safe and healthy. (Ex. 3, Letter of Alla Sorina at 32.)  Chaim was also a strong supporter of local businesses, helping them survive the pandemic.  He assisted constituents with the morass of paperwork to qualify for government PPP loans, sometimes taking them to the banks himself to help walk them through the process.  (Ex. 3, Letter of Yuri Dechanov at 7.)  He advocated tirelessly to permit local "mom and pop" businesses to reopen—providing a lifeline to many of the small businesses in the community. (Ex. 3, Letter of Alla Sorina at 32.)

Chaim also invested personally in community outreach.  Chaim regularly stopped to speak with people as he walked through his district's streets.  He never cared what they looked like, or whether they appeared to be likely voters, he remained committed to engaging with his community.  He set up talks with groups of young people who gathered in city parks, encouraging them to attend one of his community events or volunteer at his office.  He also stayed in touch with his district through his "Deutsch Report" newsletter, alerting constituents to local issues, and hosted a weekly radio program with thousands of listeners.  Before the COVID-19 crisis, he hosted outdoor movie screenings, and made a particular effort to reach constituents who did not speak English as their first language.  For example, one Urdu language program that Chaim's office hosted was attended by more than 300 people.  Chaim also went out of his way to employ staff members conversant in all of the languages spoken in his District.

When Chaim was expelled from City Council on April 27, 2021, he was locked out of his office, and it was immediately closed.  In a recent article in the *Brooklyn Paper*, a former staff member commented: "Constituent services have absolutely diminished since [Chaim's] expulsion." *See* Ben Brachfeld, "With Deutsch Gone and Staff on Way Out, Southern Brooklynites Fear Lack Of City Services," *Brooklyn Paper* (Mar. 31, 2021) ("One thing everyone could agree

about Chaim Deutsch is that nobody did constituent services like him.  He was on call 24/7 and had the relationships within agencies to produce genuine results for people.").[5]

Still, while his former council seat is now vacant and his office closed, Chaim maintains the same cell phone number he had as representative and continues to field questions voluntarily from former constituents.  He does what he can—although his ability to help has been diminished significantly.  As he continues to demonstrate, Chaim's commitment to public service is nothing short of extraordinary.  (*See* Ex. 3, Letter of Juby Shapiro at 28-29 ("In the 25 years since I have been serving the community, Chaim Deutsch has been by far the most dedicated public official I have come across.").)  Even now, Chaim still looks for an opportunity to go the extra mile for his community.

### C.      Chaim Learned the Importance of Empathy During His Humble Upbringing

Chaim's empathy for his community is rooted in his humble upbringing and harrowing family history.  His parents were Holocaust survivors who immigrated to this country from Romania and spent decades toiling in low-paying, manual labor jobs.  Chaim's family always cared for their broader community—a community that was almost eliminated by the Holocaust. After surviving these horrors, Chaim and his family understood instinctually that everyone can use a helping hand sometimes.

Chaim's father worked as a cook in kosher restaurants, at Gottlieb's Restaurant on Roebling Avenue in Williamsburg, and at summer resorts in Long Island.  His mother also worked with her hands doing piece-work for a mail-order jewelry company.  (PSR at 9-10.)  As a childhood friend of Chaim's recalls, the family "lived in poverty," in a cramped apartment in Williamsburg. (Ex. 3, Letter of Mark Caller at 1 ("[H]is parents were Holocaust survivors and lived in poverty.").)

---

[5] Available at: https://www.brooklynpaper.com/deutsch-expulsion-leaves-gaping-hole-cd48-residents/.

But the family could not even maintain this most modest space.  Chaim recalls they were illegally evicted when the landlord wanted to raise the rent. Even then, Chaim knew that the landlord's actions, including destroying bathroom fixtures to make the apartment uninhabitable (a practice now accurately described as "constructive eviction"), were illegal and wrong.  His poor, immigrant parents felt too powerless to respond in defense of their rights.  This experience of powerlessness inspired Chaim to fight for so many through his volunteer work and community service.

Chaim's childhood environment also forced him to grow up fast.  As an elementary school student, Chaim attended religious schools close to home in Brooklyn, but by the time he was 13, Chaim was sent to a boarding yeshiva in Fallsburg, New York, more than two hours away.  (PSR at 9-10.) Chaim never returned to live in his childhood home, and had to become increasingly independent from his parents.  Throughout his teenage years in yeshiva, Chaim supported himself by working at facilities for Jewish senior citizens and disabled people and at a kosher pizza shop upstate each summer. At 18, he enrolled in rabbinical college in Rochester, New York, graduating in 1987.  (*Id.*) Throughout, Chaim benefitted from care and compassion from friends and teachers—forever instilling those values in him.

### D.    Chaim is Devoted to His Family and They Depend on Him

In keeping with his family's values, Chaim also has never let his public service interfere with his commitment to family. He is a family man to his core, and spent every moment that he was not helping his constituents with his wife Sarah, and their five children.  Chaim and Sarah have been married for over 30 years, and in that time, they have built a close and loving family, instilling in their children their strong public service values.  Sarah, who is a schoolteacher, extols Chaim's devotion to his children.  Chaim's family still depends on him.  His youngest two children,

who are in their young teenage years, live at home, and while his other three children are grown, they continue to look to Chaim as the family's anchor.

Sarah and Chaim married in 1988.  Although Chaim was just 19 years old at the time, he felt much older—he had been living independently since he was 13.  Chaim and Sarah's first child, Rachelle, was born the year after they married, and their family continued to grow.  To this day, Chaim is "the rock" of his family. (Ex. 2, Letter of Sarah Deutsch at 1-3.)  He is a proud father, and was always deeply involved with all aspects of his children's upbringing.  Despite his busy public schedule, Chaim always had time for his kids.  (*Id.* ("Juggling public life and family seems effortless for him, even though it is quite challenging.").)

Chaim always prioritized teaching his children, by example, to value community service, putting aside personal inconveniences.  His daughter Sheva writes about "late night knocks" on the front door from strangers in need of assistance, or the hours spent on the phone "to help just one person who has reached out."  (Ex. 2, Letter of Sheva Deutsch at 4-5.)  Chaim showed his children that the greatest public service is done humbly and privately: "No one will ever hear about the countless people he brings home to our Sabbath table because my dad doesn't want them to be alone, or the homeless men and women he encounters and helps, all while treating them with the respect they deserve but are so rarely given." (*Id.*)

Chaim's eldest daughter, Rachelle has witnessed Chaim's community involvement her entire life.  (Ex. 2, Letter of Rachelle Sauer at 6-9.)  When she was growing up, her father and mother instilled in her to "respect everyone" and to "help those in need."  (*Id.*)  She vividly recalls her father often arriving home at 2 a.m., having worked all day, and spending the rest of the evening on community calls from the local City Councilman's office.  (*Id.*)  Eventually, Rachelle realized that a good way to spend time with her father was to join him on his walks to assist community

members throughout the neighborhood. "Until this day, I cannot walk down the streets of Brooklyn with my father without someone stopping us to thank him and to tell him to 'keep up the good work'." (*Id.*)

Despite Chaim's focus on his community work, he has always found time to dote on his children, and now does the same for his three grandchildren, who fondly refer to him as "Zaidy," grandaddy in Yiddish. (*Id.*) Rachelle describes his relationship with her children and the example Chaim provides in superlative terms: he is a "loving and endearing" grandfather, and even his young grandchildren are aware of how much their grandfather does for others." (*Id.*) They refer to Chaim as "the President of Brooklyn" because of his community involvement. (*Id.*) Rachelle writes, "I know that my boys will grow up to be even better men with him as their example." (*Id.*)

Chaim has always invested his whole heart in his family, and any separation from him would devastate them. *See United States v. Salvador*, No. 98-CR-484 (LMM), 2006 WL 2034637, at *5 n.7 (S.D.N.Y. July 19, 2006) ("family ties and responsibilities" are relevant "as determining the "'history and characteristics of the defendant' as required by 18 U.S.C. § 3553(a)(1).") (quotation marks and citations omitted).

### E. Chaim Has Always Worked Hard to Support His Family and Recently Made Great Strides Towards Rehabilitation

Following the birth of Chaim and Sarah's first child, Chaim's primary focus was building a safe and stable life for his family in Brooklyn. He immediately started working to support his new family life. His first job was in a Williamsburg garment factory called "Skylight Fashions" at a meager starting salary of $150 per week. As a new father, Chaim spent any extra time he had caring for his family. This time inevitably came before or after working long hours in the garment factory and his extra work at his local City Councilman's office.

Chaim was promoted to foreman at the factory not long after he started, and he maintained that job until the early 2000s.  When Williamsburg began gentrifying, the factory owners decided to close the factory and convert the factory to residential buildings.  Because Chaim had proven himself to be a reliable and hard worker, the owners asked him to stay on and help with the new venture.  Chaim felt fortunate not to lose his job.  Beginning in 2007, Chaim's job shifted to property management.  He first acted as a site manager overseeing the closure and redevelopment of the Skylight Fashions factory, including obtaining the certificates and licenses necessary to build multi-unit residential buildings where the factory once stood.

Over time, Chaim's responsibilities in the real estate business continued to expand as he became the manager of a portion of the group's residential rental properties. Because of Chaim's expanded role in the real estate company, his bosses asked him to form a corporate entity through which he would be paid for his work—although he had been paid as a regular W-2 employee at the garment factory.  In 2009, he incorporated Chasa Management for this purpose.

Through Chasa Management, Chaim  managed several residential  rental  buildings.  In addition to earning a regular monthly salary for his work overseeing the daily operations of the rental buildings, he also earned a commission when he found new tenants for vacant apartments in  these buildings. Chaim  was  a  hands-on  property  manager.  He was responsive to  tenant, regularly walked the buildings to oversee maintenance, managed rent rolls, and coordinated with third-party  vendors  for  repairs  and  other  services.  Over  time, Chaim built  relationships with his tenants; he enjoyed engaging with them about their lives and giving advice to  young people and families who were just starting out in New York.

Even after Chaim was elected to City Council in 2013, he continued as property manager for these buildings.  He did so until City Council changed its rules in 2016 and prohibited members

from holding most outside employment.  At that time, Chaim immediately closed Chasa Management in accordance with the new rules.

Due to his guilty plea in this case, Chaim immediately lost his seat on City Council. He remained unemployed for months.  Fortunately, his diligent efforts in seeking new employment in property management, where he had extensive experience, led him to a new full-time position.  He was hired last month by a different apartment complex in Brooklyn to manage residential buildings. His daily responsibilities include supervising a maintenance staff, inspecting the property, fielding requests from tenants, and ensuring the orderly operation of the buildings.  In the short time that Chaim has been working there, he has gained a reputation for completing maintenance projects that the prior manager failed to address.

Sentencing Chaim to a period of incarceration now would serve only to disrupt his rehabilitation, causing him to lose his new job and subject his family to further stress and tumult. A probationary sentence is warranted on that basis as well.  *See, e.g., United States v. Stowe*, 375 F. Supp. 3d 276, 279–80 (E.D.N.Y. 2019) ("Since employment is a rehabilitative necessity, the court must consider the detrimental effects of interrupting, even potentially terminating, the defendant's progress toward securing employment"); *United States v. Desilva*, No. 08-CR-332, 2010 WL 532987, at *2 (E.D.N.Y. Feb. 8, 2010) (imposing a non-custodial sentence, noting "The defendant has a strong work ethic and has made significant efforts at rehabilitation, recently gaining employment . . . .").

## III.   A PROBATIONARY SENTENCE WOULD SERVE AS JUST PUNISHMENT THAT ACHIEVES GENERAL AND SPECIFIC DETERRENCE

Section 3553(a)(2)(B) "calls upon the Court to take account of some of the broad general purposes of sentencing, specifically, "the need for the sentence imposed . . . (B) to afford adequate deterrence to criminal conduct."  *Adelson*, 441 F. Supp. 2d at 514 (quoting 18 U.S.C. §

3553(a)(2)(B)).  Section 3553(a)(2)(C) requires that a sentencing court consider "the need for the sentence imposed . . . to protect the public from further crimes of the defendant."  But these two sentencing considerations, like the others listed in § 3553(a), must be tempered by the statute's overriding mandate that the Court only "impose a sentence sufficient, but not greater than necessary," which provides "just punishment."  18 U.S.C. § 3553(a)(2)(A).  Only a probationary sentence meets these statutory requirements.

A.    **Chaim is Remorseful and Dedicated to his Rehabilitation**

Chaim has fully and completely accepted responsibility for his criminal conduct.  He has also consistently taken steps to remediate his wrongful actions, and worked towards complete rehabilitation.

Through his guilty plea on April 22, 2021, Chaim publicly accepted responsibility for his conduct.  And as he has directly expressed to this Court:

> I made some terrible decisions when I submitted my tax returns several years ago. I will regret this for the rest of my life; not only because of the consequences I and my family now face, but because I feel that I have harmed my life's work. I have always endeavored to be a role model, especially for young people. I hope that by admitting my mistakes, repaying my debts to the government, and by continuing to contribute voluntarily to the community members I have come to know and respect, I can still be an example for others and try to mend the trust that I broke. I take full responsibility for my actions and plan to make amends.

(Ex. 1, Letter of Chaim Deutsch, at 1-3.)

Chaim has also privately communicated his remorse in scores of painful and emotional conversations with family, friends, constituents, and staff members.  He views his mistakes as a cautionary tale, which he has not shied away from sharing.  Suzanne Fay Zakheim recounts one such powerful instance.  The day after Chaim was expelled from City Council, he called Ms. Zakheim, who hosts the weekly "Teens at Risk" meetings, and told her that he wanted to speak with the group to apologize for letting down his youth group by his conduct. (Ex. 3, Letter of

Suzanne Fay Zakheim at 38-40.) "That Friday night he came over with tears in his eyes; he apologized and explained that sometimes people do things they are not proud of." (*Id.*) Through this conversation and others, Chaim hopes his actions will serve as warning and encouragement always to follow the law.  He knows that many people look up to him as a role model, and is painfully aware that he has let them down.  (*See* Ex. 3, Letter of Tova Chatzinoff at 41-43 ("Chaim has always lived his life as a role model to others, and I know how heartbroken he is to know that he let so many people down.").)

And Chaim's heartfelt remorse has made an impact on his constituents and community. As one constituent writes: "I was shocked when I found out that Chaim committed a crime. I wasn't expecting it from him at all. However, it proves my point about his sense of character that he would admit that he made a mistake and did something wrong and agree to pay back the money he owed." (Ex. 3, Letter of Rachael Mandelbaum at 23-24.)  Chaim now just wants to "do the right thing" by accepting responsibility for his actions and by teaching others "to be better individuals." (PSR at 28.)

Chaim also takes personal responsibility for the deleterious effects that his crime had on the staff who worked so diligently for constituents in his City Council office.  Due to Chaim's conduct in this case, he was removed from office and his staff was laid off.  Recognizing that he was the reason for their unemployment, Chaim sought to help place them in new offices in City Council.  He spent hours on the phone with potential employers "working to ensure that his staff members would still be able to support their families." (*See* Ex. 3, Letter of Tova Chatzinoff, at 41-43.)  As Ms. Chatzinoff, one of Chaim's staff members, expressed, these efforts have made a real difference to his former staff members: "I cannot find the words to describe how grateful I am

that, while he was experiencing so much strife in his life, Chaim still took the time to do what he does best – helping the people around him."  (*Id.*)

Chaim's remorse has only deepened his commitment to make amends for his crime and put this terrible chapter behind him and his family.  He is already working on paying his $107,000 restitution obligation, and as part of his remorse and rehabilitation efforts, he has publicly spoken about that obligation as well.  As his wife Sarah attests: Chaim is "committed to paying back his debts and is crestfallen over the impact these past five years have had on our family." (Ex. 2, Letter of Sarah Deutsch at 1-3.)  In the short time since his plea and loss of job, Chaim quickly gained new full-time employment.  He dove into his old role of property manager, maintaining a new set of buildings and working with the tenants who live there.  For Chaim, it is both a fresh start after the pain and tumult of his conviction, and providing a means to pay his restitution obligation.  (*See Id.* ("Thank G-d he has found a job, working 10-12 hour days. We are now in a position to pay back the IRS . . . Our savings are depleted so we are counting on the money earned now.").)

Indeed, Chaim's demonstrable remorse is consistent with his remediation throughout this case and investigation.  When he was first alerted to the inaccuracies in his tax filings, over five years ago, Chaim immediately took corrective steps:  he retained a new accountant to prepare his tax returns going forward, retained counsel to aid him in resolving this investigation, accepted responsibility early in the process (saving the government additional time and resources), and, consistent with his plea agreement in this case, prepared amended returns for the three tax years that contained erroneous information.

Plainly, Chaim is not a recidivism risk: his remorse and rehabilitation efforts make that clear.  He is also statistically very unlikely to recidivate.  He is well beyond the age of offenders where recidivism is most prevalent.  *See United States v. Hodges*, No. 07-CR-706, 2009 WL

22

36231, at *8 (E.D.N.Y. Feb. 12, 2009) (noting that "post-Booker, courts have observed that recidivism is markedly lower for older defendants"); *United States v. Sanchez*, No. 99-CR-338, 2007 WL 60517, at *4 (S.D.N.Y. Jan. 8, 2007) ("With regard to the necessity to protect society from future crimes of the defendant, this Court and others have previously declined to impose lengthy guidelines sentences on older defendants in light of the Sentencing Commission's conclusion that '[r]ecidivism rates decline relatively consistently as age increases.'" (citing U.S. Sentencing Comm'n, Measuring Recidivism:  The Criminal History Computation of the Federal Sentencing Guidelines, at 12 (2004) and collecting cases)); *see also United States v. Hamilton*, 323 F. App'x 27, 31 (2d Cir. 2009) (reversing and remanding for resentencing because "the district court abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines").  Offenders like Chaim who have a criminal history category of I and are over 50 years old recidivate a mere 6.2% of the time.  *See Measuring Recidivism: the Criminal History Computation of the Federal Sentencing Guidelines Release One*, Exhibit 9 (May 2004) ("Measuring Recidivism").[6]  The subset of true "first offenders," those who have zero Criminal History points, are even less likely to re-offend.  *See Recidivism and the "First Offender", Release Two*, Ex. 6 (May 2004).[7]

According to the Sentencing Commission's statistics, defendants sentenced for fraud crimes with a criminal history category of I are the *least likely to re-offend*.  *See* Ex. 11 to *Measuring Recidivism*.  The Sentencing Commission has also clarified that "[t]here is no apparent relationship between the sentencing guideline final offense level and recidivism risk . . . . the

---

[6] Available with: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf.

[7] Available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf.

guideline offense level is not designed to predict recidivism, while the criminal history computation is designed to predict [it]." *Measuring Recidivism* at 13. A non-custodial sentence would achieve the deterrence envisioned by § 3553(a)(1)(C).

Particularly given Chaim's remorse, and the meaningful steps he has taken towards his rehabilitation, the goals of specific deterrence have already been met. *See, e.g., United States v. Hamilton*, 323 F. App'x 27, 31 (2d Cir. 2009) (vacating sentence because "the district court abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines."). A custodial sentence is unnecessary for the Court to heed the federal sentencing objectives of rehabilitation and specific deterrence.

### B.   Chaim's Conduct Already Has Caused Substantial Collateral Consequences Impacting All Aspects of His Life

Although admittedly harmful, Chaim's criminal conduct is an aberration from the otherwise principled life he has led. And this misdemeanor conviction already has taken a significant toll on him and his famil. Chaim lost his job as City Council member, the apex of his career as a public servant, and destroyed his public reputation. (Ex. 1, Letter of Chaim Deutsch at 1-3 ("I lost my job as New York City Council member, which had been an aspiration of mine for decades. I have disappointed the people who have looked up to me as their representative.").) It is hard for Chaim to bear the thought that his misconduct here could overshadow the many years of dedication to his community, to the residents of the 48th District, and to the people of this City more generally.

Thus, while the tax loss he caused was comparatively small relative to other defendants convicted of federal felony tax crimes in this district, *see infra* § IV, the consequences of his conviction—personal, professional and reputational—have been sweeping. This reality, coupled with dicta from other sentencing courts in this district, which have recognized that for lesser

offenses like the misdemeanor conviction here, general deterrence should not be given as much weight at sentencing as the other sentencing factors. *See, e.g., United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) ("All else being equal, large thefts damage society more than small ones, create a greater temptation for potential offenders, and thus generally require greater deterrence and more serious punishment.").

Moreover, according to empirical studies, certainty of apprehension – not severity of punishment – is the most effective deterrent in white collar cases. *See, e.g.*, Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199, 202 (2013) ("certainty of apprehension and not the severity of the legal consequence ensuing from apprehension is the more effective deterrent");[8] *accord* Peter J. Henning, *Is Deterrence Relevant in Sentencing White-Collar Criminals*, 61 Wayne L. Rev. 27, 49 (2015);[9] Richard A. Frase, *A More Perfect System: Twenty-five Years of Guidelines Sentencing Reform (Punishment Purposes)*, 58 Stan. L. Rev. 67, 80 (2005) ("Research has found that offenders are more sensitive to the probability of punishment than to its severity. . . . White-collar and regulatory offenders are more likely to be deterred, even by selective enforcement and modest penalties; such offenders have many lawful alternatives and much to lose from being convicted, regardless of the penalty."). Chaim's conviction, more than any specific sentence imposed, will provide the deterrent effect envisioned by § 3553(a)(2)(B).

Accordingly, a continued period of supervision, coupled with repayment of restitution and additional community service, will be sufficient "just punishment" to give "due respect to the law" under these circumstances. 18 U.S.C. § 3553(a). *See United States v. Stewart*, 590 F.3d 93, 141-

---

[8] Available at:
https://pdfs.semanticscholar.org/c788/48cc41cdc319033079c69c7cf1d3e80498b4.pdf?_ga=2.141
138545.217377160.1562818651-1641808574.1562818651.

[9] Available at: http://digitalcommons.wayne.edu/cgi/viewcontent.cgi?article=
1099&context=lawfrp.

42 (2d Cir. 2009) (noting "[i]t is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence."); *see also United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (loss of a defendant's "teaching certificate and his state pension as a result of his conduct" as appropriate sentencing considerations, "consistent with § 3553(a)'s directive that the sentence reflect the need for 'just punishment and adequate deterrence'") (citation omitted); *United States v. Nesbeth*, 188 F. Supp. 3d 179, 187 (E.D.N.Y. 2016) (discussing the "Second Circuit's embrace of collateral consequences as bearing upon the concept of 'just punishment'").

## IV.    A PROBATIONARY SENTENCE IS FURTHER APPROPRIATE AS IT WOULD NOT CAUSE AN UNWARRANTED DISPARITY

Although the primary duty of a sentencing court is to render a just sentence in light of each defendant's particular circumstances, as part of its individualized sentencing analysis the Court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6); *see also United States v. Wills*, 476 F.3d 103, 110 (2d Cir. 2007) (explaining the "primary purpose" of § 3553(a)(6) is "to minimize nationwide disparities"), *abrogated on other grounds, Kimbrough v. United States*, 552 U.S. 85 (2007). Only a probationary sentence would avoid the unwarranted disparities precluded by the sentencing statute.

As an initial matter, the nature of Chaim's conviction—to a misdemeanor offense, which is classified in the federal criminal code as less severe than a felony—itself favors a lesser sentence. Misdemeanor offenses represent just a tiny fraction of all federal convictions; the vast majority of cases are felonies. In 2020, of 62,712 convictions nationwide, 1,874, or 3% were for misdemeanors. In the Southern District of New York, the number was even lower: there were 16 misdemeanor convictions in 2020, representing a rate of 1.8% of all convictions. *See* U.S.S.G.

2020 Sourcebook of Federal Sentencing Statistics, Table 3.[10]   The numbers for 2019 were comparable.  Of 75,108 convictions, 2,692, or 3.6% were for misdemeanors, and in the Southern District of New York, there were 30 misdemeanor convictions, representing a rate of 2% of all convictions.  *See* U.S.S.G. 2020 Sourcebook of Federal Sentencing Statistics, Table 3.[11]   The relative rarity of misdemeanor convictions like Chaim's reflects the relatively less severe nature of his crime, and rendering a probationary sentence appropriate.

Other misdemeanor tax cases in this district—including high profile ones—have resulted in probationary sentences, even for conduct that is more severe than Chaim's.  Because of Chaim's prior position as a City Council member, the 2010 tax case involving former New York City Council President Andrew Stein is perhaps most relevant.  *See United States v. Kenneth Starr and Andrew Stein*, No. 10-mj-01135-UA (S.D.N.Y. 2010).  In that case, Mr. Stein was charged with making fraudulent statements to the IRS in a well-publicized investigation of co-defendant Kenneth Starr's Ponzi Scheme.  *See* C.J. Hughes, "Former City Council Leader Avoids Prison for Tax Evasion," *New York Times* (Mar. 15, 2011).[12]   Mr. Stein's conduct included willful failure to report income, and taking sophisticated steps to conceal significant income that resulted in more than $1 million of tax losses.  *See United States v. Kenneth Starr and Andrew Stein*, No. 10-mj-01135-UA, ECF Doc. 1, Compl. ¶¶ 32, 40, 53-56, 58-63 (S.D.N.Y. 2010).  Apart from his tax evasion, the government alleged that Stein participated in additional aggravating conduct: that Mr. Stein intentionally participated in a known Ponzi scheme, lied to IRS agents when originally

---

[10]   Available at:  https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2020/Table03.pdf.

[11]   Available   at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2019/Table03.pdf.

[12]  Available at: https://www.nytimes.com/2011/03/16/nyregion/16stein.html.

confronted about his conduct, created shell companies to avoid detection, used third-party credit cards to disguise large personal expenditures, and had a repeated pattern of evading taxes in prior years. *Id*. ¶¶ 53-70. Still, Stein pled guilty to a misdemeanor offense, and was sentenced to probation. *See United States v. Andrew Stein*, No. 10-cr-1171, ECF Doc. 1, Misdemeanor Information (S.D.N.Y. Nov. 29, 2010); *United States v. Andrew Stein*, No. 10-cr-1171, ECF Doc. 10, Judgment of Conviction (S.D.N.Y. Mar. 16, 2011).

Under any measure, Chaim Deutsch's conduct here does not rise to the same level of culpability of former City Council President Stein. While Stein attempted to conceal his crimes when the IRS made initial inquiries, Chaim immediately took remediating steps—hiring new accountants and lawyers to cooperate with authorities, addressed his tax problems and accepted responsibility—very early in the litigation process. To avoid unwarranted disparities in the treatment of similarly situated defendants, Mr. Deutsch is not deserving of a more severe sentence than his former colleague on City Council.

More broadly, a probationary sentence has been repeatedly imposed in unaggravated federal felony tax cases, including those involving far greater tax losses than those presented here. For example, recently, the defendant in *United States v. Yun,* No. 19-CR-00131 (AMD) (E.D.N.Y. 2019), was sentenced to probation on a felony conviction of willfully failing to collect and pay over $600,000 in employment taxes. *See id.*, ECF Doc. 14, Judgment of Conviction (E.D.N.Y. Oct. 21, 2019). In *United States v. Nikc*, No. 20-CR-173 (NSR) (S.D.N.Y. Nov. 24, 2020), the defendant was sentenced to probation following a felony conviction for concealing income over a four-year period, causing a tax loss of $395,745. *Id.*, ECF Doc. 22, Judgment of Conviction (S.D.N.Y. Nov. 24, 2020). Likewise, *United States v. Shokler*, No. 12-CR-415 (JBW), 2013 WL 4851695 (E.D.N.Y. Sept. 10, 2013), involved a defendant who pled guilty to a 6-count felony

indictment, including to one count of aiding in filing false tax returns related to a tax loss of over

$592,000.  The *Shokler* court imposed a probationary sentence.  *Id.*

And examples abound of defendants receiving probationary sentences for felony tax crimes

involving significant tax loss.  *See United States v. Park*, No. 12-CR-344 (FB), ECF Doc. 21,

Judgment of Conviction (E.D.N.Y. October 3, 2014) (imposing three years' probation for felony

conviction where tax loss was between $80,000 and $200,000, and the defendant had a prior

conviction for mail fraud and conspiracy to commit mail fraud in a case that involved investor

losses of $7 Million); *United States v. Edwards*, No. 12-CR-266, ECF Doc. 21, Judgment of

Conviction (E.D.N.Y. 2013) (probationary sentence imposed on the defendant, a practicing

attorney, convicted of a felony for evading taxes exceeding $167,000); *United States v. Floyd*, No.

10-CR-00309 (VM), ECF Doc. 89, Judgment of Conviction (S.D.N.Y. Apr. 8, 2013) (sentencing

defendant to three years of probation after he pled guilty to one felony count of conspiracy to

defraud the IRS related to a tax loss of $103,829); *United States v. Villela*, No. 07-CR-287 (RWS),

2007 WL 2845290 (S.D.N.Y. Sept. 25, 2007) (sentencing defendant to probation following a guilty

plea to one felony count of tax evasion related to a tax loss of $111,000); *accord United States v.

Taffaro*, 919 F.3d 947 (5th Cir. 2019) (upholding a sentence of 60 months of probation for

defendant who was convicted at trial of six counts of tax evasion, five counts of filing false income

tax returns, and one count of failing to file a tax return); *United States v. Halpern*, 17-CR-189

(CMR) (E.D.P.A. 2019) (attorney who used deceptive practices to conceal income causing

$100,000 in tax loss sentenced to probation); *United States v. Hand,* 15-CR-509 (WHW) (D.N.J.

2016) (attorney who used deceptive practices to conceal income causing over $50,000 in tax loss

sentenced to probation); *United States v. Evans*, 2:11-cr-00139-TFM (W.D. Pa. 2012) (one year

probation imposed on the defendant who committed a pattern of tax evasion spanning several years

with tax losses totaling $344,891).[13]

We respectfully submit that Chaim's sentence should be consistent with these recent cases. Without minimizing his crime, Chaim's misdemeanor conviction should not be punished more severely than recent felony convictions for arguably more serious conduct, often involving far greater tax losses. Such a result would lead precisely to an unwarranted disparity that this Section 3553(a) factor seeks to avoid.

## V.   THE PROBATION DEPARTMENT ALSO RECOMMENDED A PROBATIONARY SENTENCE

Based on Chaim's early and complete acceptance of responsibility, the substantial collateral consequences of his conviction, lack of any criminal history, significant family responsibilities, and seamless adjustment to supervision by Pretrial Services, the Probation Department likewise recommended a non-custodial sentence. (*See* PSR at 21-23.)

Chaim reiterated his contrition to the Probation Officer directly: "During his presentence interview, Deutsch expressed remorse for his actions. He admitted to being ashamed, embarrassed, and anxious about the press release regarding his current legal matter . . . he has learned from his mistake. He understands that individuals look up to him for guidance and he has let them down." (PSR, p. 22.)

As the PSR describes, Chaim took pride in "discuss[ing] his work as a council member helping individuals in his district and non-district with their needs, for example, transportation, housing, SNAP matters, and during the COVID-19 pandemic, with filing for unemployment benefits with the Department of Labor." (*Id.*) He is also bearing a significant financial burden due

---

[13] The routine imposition of probationary sentences for similar or more serious tax crimes is a further indication that jail time is unnecessary to achieve general deterrence in cases like Chaim's. His indelible conviction, the destruction of his political career and his notoriety already achieve that general deterrence goal. *See supra* § III(B).

to his crime, as "he is being held accountable for a tax los of $82,076 [plus sizable pre-judgment interest], which shall be remitted as restitution to the Internal Revenue Service (IRS)." (*Id.*)

The Probation Department thus concluded that a probationary sentence is warranted for Chaim based on "accept[ance] of responsibility for his criminal behavior," "los[ing] his job as a city council member," and his swift efforts towards rehabilitation, including gaining expedient new employment that enables him to "tend to his family responsibilities as well as remit restitution payments to the IRS." (*Id.* at 23.)  "Given the[se] factors . . . and in order to address the sentencing objectives of general and specific deterrence," the Probation Department concluded that a probationary sentence is warranted in this case. (*Id.*)

## VI.    CONCLUSION

For the foregoing reasons, Defendant Chaim Deutsch respectfully requests this Court to impose a sentence of one year of probation, with conditions of continued community service and full repayment of restitution, which collectively impose sufficient but not greater than necessary punishment to accomplish the sentencing objectives set forth in 18 U.S.C. § 3553(a).

Dated: July 22, 2021                          Respectfully submitted,
     New York, New York

                            MEISTER SEELIG & FEIN LLP

            By:          /S/HEM

                            Henry E. Mazurek
                            Evan L. Lipton
                            Ilana Haramati
                            125 Park Avenue, Suite 700
                            New York, New York 10017
                            hem@msf-law.com
                            ell@msf-law.com

                            *Attorneys for Defendant Chaim Deutsch*